Death Opinion






 

 





 



 

IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-75,793




 


ROOSEVELT SMITH, JR., Appellant
 


v.



THE STATE OF TEXAS






On Direct Appeal of


Case 1045419 of the 263rd Judicial District Court,

Harris County





 Per curiam.



 Roosevelt Smith, Jr. was convicted in June 2006 of capital murder. (1) Based on the
jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article
37.071, §§2(b) and 2(e), the trial judge sentenced the appellant to death. (2) Direct appeal to
this Court is automatic. (3) The appellant raises eleven points of error in this appeal, but he
does not challenge the sufficiency of the evidence. After reviewing the appellant's points
of error, we find them to be without merit and affirm the trial court's judgment and
sentence of death.

I. BACKGROUND

 The appellant was convicted of intentionally murdering Betty Blair while in the
course of committing a robbery. (4) The appellant was a Hurricane Katrina evacuee from
New Orleans who had arrived in Harris County shortly after the storm. He, along with
fellow evacuees Leona Walker, Jimmy Le, Stephanie Jacobo, and Le and Jacobo's 10-month-old infant, befriended Blair at the food pantry of St. Pius V Catholic Church,
where the evacuees were seeking assistance. (5) Blair, a 77-year-old recent widow,
volunteered at her church and took it upon herself to give additional assistance to a
handful of individuals. Blair focused on assisting the appellant and his friends.

 Blair gave the appellant, Le, Jacobo, and Le and Jacobo's baby some start-up
necessities, such as food, a mattress, and bicycles for transportation. She provided them
with information about obtaining their GEDs. And she allowed them to do laundry at her
house in exchange for completing yard work around her home. The week before she was
killed, Blair drove the group around Pasadena to assist them in seeking employment.

 Evidence from a pawn shop revealed that on two occasions in October 2005, prior
to the instant offense, the appellant stole jewelry from Blair and pawned the items for
cash. It appears that Blair was unaware of these thefts. 

 Additionally, the appellant's neighbor, Julio Covarrubias, testified that he had
loaned the appellant $30. When he confronted the appellant about retrieving the money,
the appellant stated that he was going to "pull a fucking lick" and would then repay him.
Covarrubias testified that the appellant said that he was going to rob Blair because she's
"got a lot of nice stuff."

 Shortly after 5:30 p.m. on October 28, 2005, Blair arrived home to find the
appellant, Le, and Jacobo, with the baby, waiting for her outside of her home. Jacobo
asked Blair if they could go inside because Jacobo had a personal female issue to discuss
with her. Blair readily admitted them into her home. While Jacobo was speaking with
Blair, the appellant picked up a nearby glass-block candle holder and hit Blair on the head
with it. Blair fell to the ground. The appellant then applied pressure to her throat with his
knee. Next, the appellant and Le carried Blair to her bedroom, placed her face down on
the bed, took off her pants, and used them to tie her arms behind her back. Blair was
choked both by hand and with a cell-phone charger cord that was pulled so tightly around
her neck that her skin folded over it. The appellant's DNA was found on the phone cord. 

 The appellant, Le, and Jacobo then stole numerous items, including jewelry, two
televisions, a computer, a camera, binoculars, a cell phone, and a piggy bank. They loaded
the items into Blair's 2004 Buick LeSabre and fled the scene.

 Blair's youngest daughter, Melissa Bishop, testified that she went to Blair's house
shortly after 6:00 p.m. because her mother was not answering the phone. She discovered
Blair's body and immediately called 911, alerting the police that Blair's car was equipped
with the OnStar tracking device. The police were able to track the car through the OnStar
system and the appellant, Le, and Jacobo were apprehended by 8:00 p.m. that evening in
west Houston. The appellant was driving the car. The police arrested all three individuals
and turned the infant over to Child Protective Services.

 The appellant was charged on October 29, 2005 with capital murder. The
indictment stated that the appellant "did then and there unlawfully, while in the course of
committing and attempting to commit the robbery of Betty Blair, intentionally cause the
death of Betty Blair by strangling the complainant with a deadly weapon, namely a cord."II. VIDEOTAPED STATEMENT

 In the appellant's first four points of error, he contends that the trial court erred in
overruling his motion to suppress his first videotaped statement. (6) 

 A. Background

 After his arrest, the appellant was taken to the Pasadena jail, where he was
interrogated by Pasadena Police Detective Eddie Rogge. The interrogations were
videotaped and broken into two interviews, with a break of approximately ten minutes
between them. Rogge informed the appellant of his Miranda (7) rights on three separate
occasions, two of which were videotaped at the start of each interview. On both
videotaped interviews, the appellant acknowledged his rights and then proceeded to
answer Rogge's questions. Yet, at the start of the second statement, there was a short time
lag in which a small portion of the interview was lost. Rogge acknowledged that the ten
minutes between the two statements were not videotaped. At the beginning of the second
interview, Rogge again read the appellant his Miranda warnings; however, due to the
time lapse and ten-minute break, some portions of conversation might have been lost. The
second videotape begins with Rogge stating, "[B]ecause every time we do this I have to
do [the Miranda warnings]," "For the third time I've read you your rights. You've asked
for a lawyer; is that right? Are you requesting a lawyer at this time?" The appellant
replied, "It's not going to stop me from answering your questions. I'm just here to answer
your questions." 

 The appellant filed a motion to suppress both videotaped statements. In the pre-trial hearing, the trial judge denied the motion to suppress the first statement, but granted
the motion to suppress the second statement because it was in violation of Miranda.
During the hearing, the trial judge focused primarily on the appellant's second videotaped
statement, discussing the appellant's purported request for counsel prior to giving the
statement. No testimony was elicited regarding the first statement, other than Rogge
testifying generally that he gave the appellant his Miranda warnings twice before taking
the first statement, that appellant acknowledged that he understood the warnings, and that
neither Rogge nor anyone else coerced the appellant or promised him anything in
exchange for the first statement. The suppression hearing covered scarcely any other
complaints regarding error with respect to the first statement and Rogge's method and
strategy in interrogation.

 Nevertheless, before the state introduced the first statement at trial, the appellant
again objected to the statement's admissibility, citing specific pages of a written transcript
of the videotape that was not made part of the record. Again, the trial judge overruled the
appellant's objections. Post-trial, the trial judge entered findings of fact and conclusions
of law, in pertinent part, as follows:

FINDINGS OF FACT


 3. Once back at the Pasadena Police Department, Detective Rogge escorted
[the appellant] to an interview room. While walking to the interview room,
Detective Rogge again (8) read [the appellant] his rights under [Article] 38.22
of the Texas Code of Criminal Procedure. At this time, [the appellant]
agreed to waive his rights and speak to Detective Rogge. 

 4. Detective Rogge then placed [the appellant] in an interview room at
the Pasadena Police Department and a video recording was started to
record [the appellant's] statement. Once Detective Rogge entered the
room, he again read [the appellant] his rights under [Article 38.22]
on the video recording. On this recording, [the appellant] indicated
that he understood each of his rights and began to voluntarily speak
with Detective Rogge.

 5. No force, promises, threats or intimidation were used by police
authorities either before or during the taking of [the appellant's]
statement nor does [the appellant] appear to be under the influence of
any intoxicant. [The appellant] appears to be fully aware of his
surroundings and competent to understand the nature of his situation.


CONCLUSIONS OF LAW

 2. [The appellant] was given his statutory rights under [Article] 38.22
of the Texas Code of Criminal Procedure at least 3 times prior to the
taking of his first statement. The third time the [appellant] was given
his statutory rights under [Article] 38.22 of the Texas Code of
Criminal Procedure, it was recorded on video along with his first
statement. [The appellant] understood these statutory rights and
freely and voluntarily waived these rights, providing Detective
Rogge with a video recorded statement.

 3. This video recorded statement of [the appellant] was taken by
Pasadena Police Detective E. Rogge in accordance with [Article]
38.22 of the Texas Code of Criminal Procedure. Further, the taking
of said statement did not violate [the appellant's] rights under the
Fifth, Sixth, and Fourteenth Amendments of the United States
Constitution and Art. 1, Sec. 10 of the Texas Constitution.

 The appellant now argues that his "confession was not voluntary and was the result
of the promises and other coercive actions of law enforcement officers." Specifically, he
complains that the first videotaped statement was taken in violation of his Fifth and
Fourteenth Amendment constitutional rights, as well as in violation of Articles 38.21 and
38.22.

B. Miranda

 In his third and fourth points of error, the appellant contends that his first video
confession was obtained in violation of Miranda (9) and Article 38.22 § 3(a)(2), because he
did not knowingly, intelligently, and voluntarily waive his rights. Specifically, he claims
that the police procedure used in this case was calculated to undermine the protections
provided by Article 38.22 and Miranda. (10)

 The appellant concedes that Rogge properly gave him the required constitutional
and statutory warnings and that he did acknowledge each of them. Indeed, the videotaped
interview indicates that Rogge offered to explain the warnings if the appellant did not
understand them. The appellant now argues, however, that the interrogation was
erroneous because there is no evidence that he explicitly waived his rights. 

 1. Established Law

 Article 38.22 §3(a)(2) requires that an oral statement resulting from custodial
interrogation must contain a warning informing the defendant of his rights, (11) and that
there be a knowing, intelligent, and voluntary waiver of those rights. This waiver of rights
may be inferred from the actions or words of the person being interrogated. (12) "A waiver
may be found in an express written or oral statement or, in at least some cases, may be
inferred from the actions and words of the person interrogated." (13) As this Court stated in
Barefield, "[w]e do not . . . interpret the oral confession statute to require an express
verbal statement from an accused that he waives his rights prior to giving the
statement." (14) We look to the totality of the circumstances when determining voluntariness
of the waiver. (15)

 2. Application

 The appellant argues that our holding in Garcia v. State (16) requires explicit waiver
language beyond the defendant's acknowledgment that he understands his rights and his
voluntariness in continuing the interview. In Garcia, this Court held that a written
confession was admissible despite the absence of an explicit oral or written waiver. We
explained that a waiver could be inferred from the language contained in the written
statement itself. (17) The appellant contends that our reliance on the language described in
Garcia indicates that we now require additional language on the part of the accused in an
oral confession as well. The appellant reads Garcia too broadly for it to apply in this case.

 In Garcia, this Court analyzed the totality of the circumstances surrounding the
defendant's written statement. In Garcia, we found that there were sufficient indications
that the defendant had waived his rights and had voluntarily given his statement, based in
part on the language of the document. Specifically, we noted that the warnings appeared
multiple times on the face of the document, the defendant had initialed them on each page
of the statement, and he had signed a sentence on each page reciting that he had read the
statement. (18) Garcia did not overrule or modify Barefield in any way, and it did not discuss
the symbiotic nuances of an oral waiver of rights.

 In the instant case, the trial judge, after viewing the videotaped statement and
conducting a hearing on the motion to suppress, concluded that the appellant evidenced
an understanding of his rights and that he knowingly and voluntarily waived them. The
findings of fact and conclusions of law support the record and reflect this reality. 

 In the first videotaped statement, the appellant indicated to Rogge that he
understood each right as it was read to him. He repeatedly acknowledged Rogge's
statements and was vocal in his responses in the affirmative. Then, without hesitation, the
appellant proceeded to discuss the case with Rogge. The interview lasted approximately
one hour, which included the Miranda warnings at the onset. As noted during the
suppression hearing, the appellant mentioned his right to counsel following his first
statement, and before his second. This invocation of his right to counsel further
demonstrates that the appellant understood his rights and voluntarily waived them when
he gave the first statement. Simply because Rogge informed him of the nature of the
charges and the gravity of his pending charges, does not indicate a threat so egregious that
it trampled the appellant's constitutional protections. Rogge complied with Article 38.22
and with Miranda, sufficiently warning the appellant of his rights. The appellant clearly
waived his rights and voluntarily confessed, and as a result, we find that the trial court did
not err in overruling the appellant's motion to suppress his first statement. Points of error
three and four are overruled.

 B. Government Coercion

 In points of error one and two, the appellant argues that the trial court erred by
denying his motion to suppress his first videotaped statement because it was involuntary
due to Rogge's coercive interrogation. He claims that his rights were violated under
Articles 38.21 and 38.22 § 6, and under the Fifth and Fourteenth Amendments to the
United States Constitution. (19)

 The appellant contends that, during the first videotaped interrogation, Rogge made
several comments that prove he promised the appellant that he would not be charged with
capital murder if he confessed, and that this amounts to impermissible coercion. The
videotape shows that, after several minutes of questioning in which the appellant stated
that he, Le, and Jacobo went to burglarize Blair's home and steal her car, the following
conversation took place: 

 Appellant: Let me ask you something. What are we charged with?

 Rogge: At this exact moment - nothing. Nothing.

 Appellant: Nothing?

 Rogge: Not right this minute. Do you want to know what you're
going to be filed on for?

 Appellant: Yes, sir.

 Rogge: Capital murder.

 Appellant: Huh?

 Rogge: Capital murder.

 Appellant: How?

 Rogge: Because I'm going to show you how it's done. And what I'm
going to do for you is let you help yourself. You can either be
. . . stonewall me, and lie to me where I can prove you're
lying to me and I'll get you the death penalty or you can tell
me the truth and help yourself. Cause you fucked up. And
[Le] fucked up, and [Jacobo] fucked up. I'm just talking
straight with you.

 Appellant: O.K.

 Rogge: And the only person who can help you right now is you. I'm not
blowing smoke up your butt or anything. Talking straight with you.
You're [sic] lying to me and stuff ain't going to help. I want to know
the truth. Now tell me the truth. I know what happened. We have
evidence. We have witnesses. I have other statements. Now if you
want to screw yourself, lie to me. Or you can tell me the truth.

 Appellant: Capital murder. Lord have mercy. I'll never see my son again. Ever.
Yes, sir. This is the best I can help myself now.

 Rogge: And that's it. Just tell me the truth and get right with God.

* * *

 Rogge: That's all I'm asking. Do you know what this depends on? If
you're going to get life or the needle. It's that simple. And
again, the only person that can help you . . . We know what
happened. We have the evidence there. We got everything
there is. And this is your chance to help yourself.

The appellant subsequently confessed to his involvement in the murder, but still
contended that Le was the one who choked Blair. He now argues that the included
portions of the first statement amounted to impermissible government coercion and is
reversible error.

 1. Established Law

 In reviewing a trial court's ruling on a motion to suppress, the appellate court
views the evidence in the light most favorable to the trial court's ruling. (20) "When a trial
court makes explicit fact findings, the appellate court determines whether the evidence
(viewed in the light most favorable to the trial court's ruling) supports these fact findings.
The appellate court then reviews the trial court's legal ruling de novo unless the trial
court's supported-by-the-record explicit fact findings are also dispositive of the legal
ruling." (21) "If the trial court's findings of fact are supported by the record, an appellate
court is not at liberty to disturb them, and on appellate review, we address only the
question of whether the trial court improperly applied the law to the facts." (22)

 Article 38.21 provides that "[a] statement of an accused may be used in evidence
against him if it appears that the same was freely and voluntarily made without
compulsion or persuasion, under the rules hereafter prescribed." Under federal due
process principles, a statement is involuntary if the defendant was offered inducements of
such a nature, or coerced to such a degree that the inducements or coercion produced the
statement - not the defendant's free will. (23) "There is obviously no reason to require more
in the way of a 'voluntariness' inquiry in the Miranda waiver context than in the
Fourteenth Amendment confession context. The sole concerns of the Fifth Amendment,
on which Miranda was based, is government coercion." (24) The determination of whether a
statement is voluntary is based on an examination of the totality of the circumstances
surrounding its acquisition. (25) This review must be completed in light of the arguments,
information, and evidence that was available to the trial court at the time of its ruling. (26)

 2. Application

 The appellant proffers no persuasive argument or authority that his confession was
not voluntarily given, and our review of the record reveals no evidence showing that his
statement was not voluntary. In fact, no argument was ever made to the trial court, either
during the motion to suppress hearing or during the guilt and innocence portion of the
trial, regarding the specific remarks complained of on appeal. (27) Rather, the appellant
relies almost exclusively on the fact that Rogge informed him of the nature of the
purported charge and of its punishment, claiming that when Rogge urged the appellant to
"be straight with [him]" in order to help himself, that those statements rose to the level of
police coercion. We disagree.

 The appellant was apprehended at approximately 9:10 p.m. and questioned several
hours later at approximately 2:10 a.m. The time frame was not unreasonably long to wait
for interrogation, and the reason he was not questioned immediately upon arrest is that
Rogge first ensured that the stolen vehicle in which the appellant was apprehended was
properly transported and locked in a secure location, and then he questioned Le and
Jacobo prior to questioning the appellant. These combined reasons pushed the appellant's
interview back to 2:10 a.m.

 In looking at the totality of the circumstances, (28) we observe that the appellant (1)
was read his Miranda warnings, (2) acknowledged his rights on the record, (3) agreed to
continue speaking with Rogge, (4) freely offered information pertaining to the offense,
(5) was seated the full time, mostly with his hands folded over his chest, (6) was not
handcuffed during the course of the interview, (7) was not physically touched by Rogge
or any other police officer during the course of the interview, (8) was permitted time to
ask questions of his own, and (9) was not prohibited from stopping the interview at any
time. Despite this, the appellant still contends that he was coerced into confessing out of a
fear of the death penalty. Yet not once during the interview did the appellant stand up and
try to leave, only to be met by force or coercion. Not once during the interview did the
appellant appear to be forced into submission. When Rogge asked the appellant questions
regarding his relationship with the victim and the co-defendants, about his activities on
the day of the offense, and about the specific nature of the offense, the appellant freely
offered responses.

 Rogge's statements, which the appellant deems a threat, "offensive to due process,
and [sic] draws a line the police may never cross, not even with a suspect who has been
warned and has expressed a willingness to speak to them," do not affirmatively promise
that the appellant would not get the death penalty if he confessed. At best, the comments
convey the understanding that the appellant would most likely get the death penalty if he
were found to be lying; if he told the truth, he would have a chance at a life sentence. (29)
When the appellant stated that he was trying to cooperate with Detective Rogge because it
was "probably" the only thing that would save him from the death penalty, his statement
did not inherently mean that he was being offered a deal with the police for a life
sentence. In fact, when the appellant testified at the suppression hearing, he did not even
say that Rogge had promised him anything or that he felt coerced to make his statement. (30)
He offers nothing new to this Court to combat his prior statement.

 The record, viewed in the light most favorable to the trial court's ruling, supports
the finding that no force, promises, threats or intimidation were used to obtain the
appellant's statement. The trial court did not err in denying appellant's motion to
suppress. Points of error one and two are overruled.

D. Instruction of the Voluntariness of Confession

 In his fifth point of error, the appellant complains that the trial court erred in
failing to instruct the jury on the voluntariness of his confession as required by Article
38.22, § 6. The appellant cites our opinion in Oursbourn v. State (31) for the proposition that
the trial court was obligated to provide a jury instruction because the voluntariness of his
confession was litigated at the suppression hearing. 

 1. Established Law

 To preserve an error for appeal, an appellant must make a timely complaint that
states the grounds for the objection with "sufficient specificity to make the trial court
aware of the complaint," and the trial court must rule or refuse to rule on the objection. (32)
Nevertheless, an appellant may still complain of jury-charge error for the first time on
appeal. (33) Under Almanza, an appellant who complains of an unobjected-to error in the
charge on appeal is entitled to reversal if he can show the error caused him "egregious
harm." (34)

 The Code of Criminal Procedure provides further instruction for the issue of
voluntariness. Under Article 38.22, § 6, following a finding of voluntariness by the trial
court at a suppression hearing, a defendant still may offer evidence before the jury
suggesting that the confession was not voluntary. (35) If a defendant offers such evidence,
the trial court is obligated to provide a jury instruction on voluntariness. (36) Conversely, if
no evidence of involuntariness is presented, no instruction is required. (37)

 2. Application

 In the instant case, the appellant did not object to the jury charge at trial. While his
lack of objection does not prohibit relief, it does subject him to an "egregious harm"
analysis under Almanza. The appellant, however, does not focus his argument on
"egregious harm" for this issue. Instead, he relies on our opinion in Oursborne, which
stands for the broad proposition that if an issue of voluntariness is litigated, then the
appellant is entitled to a jury instruction on voluntariness.

 This argument does not meet the high burden of "egregious harm." To prove
"egregious arm," the appellant, again, relies on his contentions in points of error one and
two that the police coerced him into confessing. This argument is neither developed nor
persuasive, proffering no new evidence or case law to dispute the trial court's findings. (38)
Since we find no egregious error in the jury charge on voluntariness, point of error five is
overruled.

III. BATSON CHALLENGES

 In his sixth and seventh points of error, the appellant claims that the trial court
erred in overruling his Batson (39) challenges regarding two African-American venire
members: Staci Traylor and Yolanda Branch. The appellant objected to the State's
peremptory strikes for these venire members, claiming they were racially motivated. The
trial court held a Batson hearing in which the prosecutors testified as to their race-neutral
reasons for exercising the peremptory strikes. The trial court found that the State did not
strike the respective venire members on the basis of race and overruled each of the
appellant's challenges, ultimately seating a jury with no African-American jurors.
Although no African-Americans served on the jury, we do not know how many of the
venire members were African-American. 

 A. Established Law

 In Batson v. Kentucky, the United States Supreme Court held that discrimination
on the basis of race during jury selection violates the Fourteenth Amendment. (40) Motivated
by a need to eliminate racial prejudice from peremptory strikes, the Batson court devised
a three-part test to determine whether purposeful racial discrimination was employed in
voir dire procedures. (41) Batson and its progeny require: (1) the defendant to first establish
a prima facie case that the State exercised its peremptory strikes in a discriminatory
manner; (2) the prosecutors to next offer race-neutral explanations for their use of
peremptory strikes; and (3) the trial court to ultimately determine whether there was
purposeful discrimination. (42) "At [the third] stage, implausible or fantastic justifications
may (and probably will) be found to be pretexts for purposeful discrimination." (43) We
review the record of a Batson hearing and the voir dire examination in the light most
favorable to the trial court's ruling. (44) "The trial court's determination is accorded great
deference and will not be overturned on appeal unless it is clearly erroneous." (45)

 When making its Batson finding, the trial court "should consider all relevant
circumstances" (46) and will review "all of the circumstances that bear upon the issue of
racial animosity." (47) These circumstances may include "a 'pattern' of strikes against black
jurors included in the particular venire [which] might give rise to an inference of
discrimination." (48) They may also include the number of peremptory strikes used on
minority jurors, the make-up of the venire, comparisons with other venire members'
responses, (49) as well as the plausibility of the prosecutor's explanation for the peremptory
strike. (50) We look to United States Supreme Court precedent for guidance in determining
the propriety of the trial court's Batson rulings.

 In Miller-El v. Dretke, the United States Supreme Court stated that statistics of the
amount of black venire persons struck from a panel, as well as comparisons between
black and non-black venire persons may be considered as evidence of purposeful
discrimination in a Batson challenge. (51) The Court determined this by looking at the
makeup of the venire panel: on a 108-person panel, nine out of 20 African-American
venire members were excused for cause or by agreement, while 10 were peremptorily
struck by the State. (52) These statistics reveal that the State used two-thirds of its
peremptory strikes to exclude 91% of the eligible African-American venire persons,
which the Court found to be a compelling factor in its finding of racial discrimination. (53)
Moreover, the Court looked at a side-by-side comparison of the black venire members
who were struck with the white venire members who were allowed to serve on the jury,
citing the disparity in treatment as "evidence tending to prove purposeful discrimination
to be considered at Batson's third step." (54) The Court further stated that the comparative
evidence was even "more powerful than these bare statistics." (55)

 In Snyder v. Louisiana, the United States Supreme Court found that the trial court
erroneously rejected a Batson objection for a black venire member, based on the "[t]he
implausibility of the prosecutor's explanation" for the strike. (56) The prosecutors
questioned a venire panel of 85 members, challenging all but 36 individuals for cause. (57)
Five of the remaining 36 were black and all five of these persons were peremptorily
struck by the State. (58) The prosecutor explained that he struck Jeffrey Brooks, one of the
African-American venire persons, because Brooks had voiced a concern about missing
some college work. The State reasoned that, in order to shorten his jury service, Brooks
would "come back with guilty of a lesser verdict so there wouldn't be a penalty phase." (59)
The Court rejected this argument, finding the racially-neutral explanation proffered by the
State to be unconvincing. It noted first, that after being contacted by the court clerk, an
administrator at Brooks' school stated that his jury service would not be a problem; and,
second, that the State accepted, without question, white jurors who also disclosed
conflicting obligations that were at least as serious as Brooks'. (60) As a result, the State's
peremptory strike was determined to be race-based in violation of Batson. (61)

 We now turn to the two Batson strikes in the instant case. We need not address the
first prong of the Batson test to determine whether the appellant established a prima facie
case for two reasons. First, both objections were preserved properly in the record. Second,
the issue of a prima facie case became moot once the prosecutor articulated his reasons
for the challenged peremptory strike and the trial court ruled on the ultimate question of
intentional discrimination. (62) The prosecutor then proffered race-neutral explanations for
both strikes, satisfying the second prong of the Batson challenge. This analysis, therefore,
will focus on a review of the trial court's decision in rejecting the Batson objections to
venire members Staci Traylor and Yolanda Branch.

 B. Staci Traylor

 In point of error six, the appellant argues that juror number 170, Staci Traylor, was
improperly struck from the venire panel. The venire panel began with 209 individuals,
and by the time Traylor was questioned, the defense had peremptorily struck 17 venire
members while the State struck 11. (63) While two of the State's 11 peremptory strikes were
used on African-Americans, Traylor was the first African-American venire person to be
peremptorily struck from the panel. (64) Traylor's answers on her juror questionnaire
revealed that she had previously been opposed to the death penalty. She confirmed this
belief during voir dire, and further explained her position by stating that she felt
uncomfortable and would lose sleep over making a decision in a death case. She said on
voir dire, "I would answer the questions truthfully, but I would sometimes think about the
consequences of answering the questions truthfully. That's the part that would probably
keep me up at night." She also said, however, that she believed that there were
appropriate cases for the death penalty and that she would be able to follow the law and
base her decisions on the evidence.

 At the end of questioning, the State expressed its desire to use its eighth
peremptory strike against Traylor. The defense immediately made a Batson challenge:

[Defense]: And Judge, we'd like a Batson objection. Basically, she answered all the
questions like everybody else, African-American like the defendant, his
same race.


[Court]: All right. From the State, please.


[State]: Your Honor, from the State, as you heard the juror respond to the questions
and also in the questionnaire, it's her opinion that the death penalty is cruel
and unusual punishment. She made a series of answers in her questionnaire
that she has a prior opposition to the death penalty. She feels that the death
penalty is cruel and unusual punishment. She feels that the death penalty
should be or that - that she, as she testified to as she - when she was on the
stand that she would have a lot of difficulty in the jury room answering
those questions according to the law and the evidence knowing that the
result would be the death penalty. She said that she would honestly do that,
but that it would be extremely difficult for her. 


[Court]: Those are race neutral. And so we'll strike her, the State will. I will strike
and I think that's [sic] State's got quite a few left.

 The appellant now contends that the Court improperly excused Traylor from the
panel "without addressing the matters raised by the Defense or stating that he had
considered whether the reasons submitted by the State were a device to mask
discrimination." The appellant's argument is premised on the presumption that, because
Traylor "answered the questions like everyone else," the reasons proffered by the State
must be racially-motivated.

 We will review the trial court's decision based on what the trial court knew when
overruling the objection. By the time Traylor was questioned, nine jurors had been
selected. None of these jurors had any stated opposition to the death penalty. (65) In contrast,
of the State's seven prior peremptory strikes, four answered their questionnaires exactly
like Traylor. They stated that they had previously been opposed to the death penalty or
had other problems with it. These same venire members each said, similar to Traylor, that
they could set their views aside and decide the case based upon the law and facts. The
State used its other three peremptories on an attorney, a venire person who had work
conflicts, and a venire person who had trouble understanding the burden of proof. The
appellant suggests that some black venire persons were dismissed by agreement is
evidence that the State violated Batson. We do not agree. The defense is equally
responsible for the removal of those venire persons from the panel and cannot later
complain that their removal resulted from any alleged purposeful discrimination on the
State's part. (66)

 We find that the State did not single Traylor out from the other venire persons on
the basis of her race. The record before us corroborates the trial court's ruling that the
State's peremptory strike of Traylor was race-neutral. There were no "implausible"
explanations provided by the prosecutor that would lead the trial court to question the
motivation behind the peremptory strike. (67) The trial court believed the race-neutral
reasons for striking Traylor from the panel, and we see no error in the ruling.

 Nevertheless, despite the fact that the record supports the plausibility of the State's
race-neutral explanation, we shall present a side-by-side analysis of the two venire
members that the appellant compares: Traylor and venire member 173, Stephanie French.
The State questioned both venire members at length, regarding their general opinions
surrounding the death penalty. The State then discussed the enumerated offenses
described in the legislature's definition of capital murder. And finally, the State
questioned the venire members about the three special issues regarding punishment,
discussing them at length until both venire members responded with understanding. (68) The
State also passed each witness to the defense for questioning, and it was the defense who
did not question Traylor regarding her opinion. From the record, we note that French
answered, "of course, yes," to numerous questions regarding her ability to impose the
death penalty, where Traylor vacillated on similar questions.

 The appellant's argument, which focuses on the comparison of Traylor with
French, does not show disparate treatment, nor does it indicate racial discrimination. The
comparison between Traylor and French was not possible at the time of this Batson
challenge because French had not yet been questioned. Thus, even in a side-by-side
comparison of the two, we agree with the trial court's determination of race neutrality in
the State's explanation. We note that, in his brief, the appellant appears to argue - not that
Traylor was peremptorily struck on the basis of race in comparison to venire member 173,
Stephanie French - but rather that Traylor would have been a superior juror to French.
This, quite simply, is not a matter of review for this Court. The responsibility of selecting
a jury by conducting voir dire lies within the discretion of the parties. (69) When that
discretion is based on "racial animosity," (70) the Court will intervene. (71) In this case, the trial
court found that the prosecutor's race-neutral explanation for venire member Traylor was
sufficient, and we agree.

 C. Yolanda Branch 

 In his seventh point of error, the appellant alleges that the State peremptorily
struck juror number 179, Yolanda Branch, on the basis of race. Branch was questioned
after both Traylor and French, when the State had one peremptory strike remaining.
Following questioning by both parties, the State moved to use its last peremptory strike
against Branch. Portions of the transcript reveal the Batson challenge that followed:

[Defense]: Judge, at this time we would lodge a Batson objection indicating, again, the
venireman just excused by the State is African-American, as is [appellant].
That the questionnaire and the answers been given by [Branch], No. 179, is
in - comports with the questionnaire, almost mirrors the answers given by
the white female, No. 173, that was accepted, that being Stephanie French
that was accepted by the State. And so that, just like in 170, [Traylor], and
then 179; the only difference is that [French] is a white female, [Traylor]
and [Branch] happen to be black females. 


 And I am offering as part of the record for the voir dire what's marked as
Defendant's Exhibits 1, 2 and 3 voir dire, the questionnaires of [Traylor],
[French], and [Branch].


 That concludes our Batson.


[Court]: And from the State, please. 


[State]: Your Honor, as to the State, as it relates to the questionnaire of Branch,
you'll note in her response to the questions on Page 10 she indicates, I do
not believe in capital punishment, which is Question No. 9. That is, I do not
believe, and if you'll notice Ms. French's questionnaire, she did not check
No. 9 that she agrees, I do not believe in capital punishment. 

 

 As to the other race neutral reasons, Your Honor, French [sic] (72) indicates on
her questionnaire that she believes the criminal laws are too harsh, response
to Question No. 69. She also believes in response to Question 82, that the
death penalty is used too often. As it relates to Question No. 81, she wrote
N/A, not applicable in response to the question: The purpose . . . the death
penalty serves in society. I asked her what purpose she believed the death
penalty served, if she could think of any in favor, any arguments in favor of
the death penalty and she stated none. She also indicates on her
questionnaire as her argument against the death penalty that no one has the
right to take a life. Additionally, Questions No. 50 and 51 - 50 being why
people commit violent crimes, she's checked not applicable. 51, what
makes a person dangerous, also no response with the N/A, not applicable.
Feelings on the criminal justice system, Question No. 65, also checked not
applicable.


 In addition, [Branch], stated that she is opposed to the death penalty and
that she would favor life without parole and would shade her answers in
such a way to get the result that she favors, life without parole. 

 

[Defense]: May I respond, Judge? 

 

[Court]: Briefly. 

 

[Defense]: Yes, sir. If you look at the totality of the circumstances, we now have 10
white jurors. Every African-American that has taken the witness stand has
either been struck for cause by the State or they have been used or the State
has used a peremptory on those African-Americans. In addition, as we have
opted to excuse some business agreements where the defense will offer up
5, 3, and those type people and traded them off, the State has offered up
each time those other African-Americans, whoever answered the
questionnaires from their perspective and so they have traded African-American males and females in the trade process. 

 

 So, when you take the totality of the circumstances and you focus in
on not only this woman here, [Branch] and [Traylor], it is clearly - 
the M.O. is, make sure we get no African-Americans on this panel.
And that's where we are and that's where it stands.


[Court]: I find the issue is race neutral and she will be excused as a strike by the
State.

 The appellant now argues that "the record does not fit the prosecutor's
explanations." He contends that, while the State's reasons are indeed race-neutral, they do
not explain what transpired during voir dire. At trial, the appellant specifically claimed
that Branch's questionnaire "mirrors the answers given by the white female," selected-juror French. In comparing the two questionnaires, we find this claim is not supported by
the record. The differences are highlighted by the State in its above response, with the
most glaring distinction reflected in each woman's opinion of the death penalty. 

 When asked to choose the statement on the questionnaire that best summarizes
their general view on capital punishment, French selected "I am neither generally opposed
nor generally in favor of the death penalty for capital murder," while Branch chose "I am
opposed to the death penalty for capital murder except in a few cases where it may be
appropriate." French agreed with the statement, "Capital punishment is absolutely
justified," while Branch disagreed with the same statement. French also agreed with the
statement that "We must have capital punishment for some crimes," while Branch, again,
disagreed. The State asserted that it was Branch's opinion on the death penalty that gave
reason for her strike. As a result, the appellant's contention that both questionnaires are
the same fails. 

 Although the two venire members' questionnaires were similar, they were not
identical. Nor were their responses during voir dire. Even if compared side-to-side,
Branch and French did not give identical responses during voir dire. Branch wavered on
her opinion of the death penalty and when to apply it, while French did not. When
discussing punishment, Branch stated that she would "shade [her] answers in a way that
would result in life without parole, rather than death," while French would be able to be
involved in the process of judging punishment, stating, "I mean, if that's-that's the way
that it's going to be, of course, yes." The mere fact that the two venire members possess
similar characteristics, save their race, does not imply that they received disparate
treatment. Their answers do reveal differences in their attitude toward the death penalty.

 The appellant also argues, relying on Miller-El, that the totality of the
circumstances in the instant case reveals a particular environment of racial
discrimination. (73) Here, the inference of race-based discrimination, as expressed in Miller-El, does not apply to either venire member Staci Traylor or Yolanda Branch. Although the
jury was sworn in with no black jurors, there was no evidence here of a systematic policy
to exclude African-Americans, as was the case in Miller-El. (74) The State offered race-neutral reasons for its peremptory strikes of Traylor and Branch that, as shown by a
thorough review of the record, were not merely pretexts for purposeful discrimination.
Additionally, the explanations provided by the State were plausible to the trial court, and
are plausible to this Court. The State took care in questioning and treating all of the
prospective jurors consistently. Viewing the evidence in the light most favorable to the
trial court's ruling, we cannot conclude that the trial court's rulings on the peremptory
strikes of Traylor and Branch were clearly erroneous. Therefore, points of error six and
seven are overruled. (75)

IV. AUTOPSY PHOTOGRAPHS

 In his eleventh point of error, the appellant complains that the trial court erred in
admitting nineteen autopsy photographs of the victim into evidence at the guilt phase of
trial. (76) Specifically, he alleges that the prejudicial nature of the photographs substantially
outweighed their probative value because the photographs were gruesome and needlessly
cumulative. (77) At trial, however, the appellant did not object to the gruesomeness of the
photographs - he complained only of their cumulative nature - and as a result, this
component of the appellant's argument does not comport with his complaint at trial. (78) To
preserve error on appeal, the record must show that the complaint was made to the trial
court by a timely request, objection, or motion, and that the trial court ruled on that
request. (79) Here, the appellant's objections were to the duplicative prejudicial nature of the
photographs; he did not object to the gruesomeness of the photographs that were
admitted, and therefore, we shall only address the cumulative nature of the exhibits. (80) 

 It should be noted that, in his brief, the appellant also alleges that he was
prejudiced because the State introduced the complained-of exhibits purely to remind the
jury that the victim was white and that he was black. He claims that the photographs were
"[a] vehicle by which the prosecutors could - and did - get the race factor into the jury
room where the testimony couldn't go." (81) He focuses on the color photographs in this
argument, returning to a greater theme of racial animosity. (82) We find this argument to be
purely speculative. We further note that the State introduced several other autopsy
photographs to which he did not object and that he does not now complain were
introduced for purely racial purposes. Without more persuasive authority, we shall not
entertain this argument.

 A. Settled Law

 When determining whether the trial court erred in admitting relevant photographs
into evidence, our review is limited to deciding whether their probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading
the jury, or by considerations of undue delay or needless presentation of cumulative
evidence. (83) The trial court's decision is reviewed under an abuse of discretion standard,
and it may be disturbed on appeal only when the trial court's decision falls outside the
"zone of reasonable disagreement." (84)

 A court may consider many factors in determining whether the probative value of
photographs is substantially outweighed by the danger of unfair prejudice. This Court's
opinion in Long v. State illustrates the current standard:

In determining whether the trial court erred in admitting
photographs in evidence, the controlling factor is whether the
probative value of the photographs was greatly outweighed by
their prejudicial effect. The prejudicial effect of the photographs
may be determined by the number of exhibits offered, their
gruesomeness, their detail, their size, whether they are black and
white or color, whether they are close-up, whether the body is
naked or clothed, and by factors unique to each situation
photographed. (85)


This list is not exclusive. When determining prejudice, "[t]he availability of other means
of proof and the circumstances unique to each individual case must also be considered." (86)

 B. Exhibits

 The appellant objected to several exhibits in pairs, arguing that only one of each
photograph need be admitted to prove the respective injury. The disputed exhibits were
introduced during the testimony of Dr. Stephen Wilson, Assistant Harris County Medical
Examiner. He explained that the photographs would help him detail his actions to the
jury. All of the photographs were 8 ½ by 11 inches in size and were in color. (87) 

 1. Exhibits 124 and 130

 The appellant objected to Exhibits 124 and 130 together as being duplicative,
claiming "whatever it is we need to garner from those two photographs, they can be
garnered from one as opposed to both." Exhibit 124 is a photo of the victim as she was
received by the medical examiner, with her hands bound behind her back and a phone
cord wrapped around her neck. Exhibit 130 is a close-up of the victim's face and the
ligature around her neck, showing her necklace compressed beneath the ligature. There is
a small ruler next to the victim's face that was used to illustrate the actual size of the
ligature and its impressions. The Court ruled on these photographs in conjunction with
Exhibits 123 and 130 as a pair, (88) overruling the objection. Dr. Wilson later used Exhibit
130 to explain the congested features of the victim's face and also to show that the blood
vessels beneath her skin were distended. While the photographs were near duplicates of
each other, they were sufficiently distinct in magnification and angle to help the witness
with his testimony. We find that the court's admission of these two exhibits was proper.

 2. Exhibits 142 and 155

 The appellant also objected to the duplicative nature of Exhibits 142 and 155.
Exhibit 142 is photo of the victim's face, illustrating the bruising that resulted from the
offense. The victim's eyes and mouth are closed. Exhibit 155 is a close-up of the victim's
mouth with the upper lip extended, revealing her upper teeth and showing the bruising to
the victim's lower lip, which was not visible in Exhibit 142. Although the appellant
argues that other photographs in this series of photographs sufficiently "prove up the
bruises to the neck, the face, the lips and the neck," the trial court overruled the objection,
stating that "to me, they're dissimilar." We agree with the trial court. 

 3. Exhibits 162 and 163

 Exhibit 162 is a photograph of the front and left side of the victim's neck
illustrating bruising in the area, while Exhibit 163 is a close-up of the back portion of the
same side of her neck with her head turned and hair pulled up, illustrating the severity of
the bruising in this area. Dr. Wilson used these photographs to describe the pressure
applied to the victim's neck - most likely by someone's hands - in addition to the ligature
strangulation. The trial court noted that, although the photographs were similar, there was
no undue prejudice in admitting both. The trial court initially seemed to agree with the
appellant, stating that the two photographs "look the same to me. What's the difference?"
The State explained their difference: 

[State]: 163 shows this portion of the neck and the bruising. This 162 illustrates this
part of the neck and the three bruises that appear right there, you can see
them. Because the - this picture, the first picture focuses on this portion of
the neck, you don't clearly see these - you see these three bruises right here.


[Court]: Okay. So why not just use 162?


[State]: Because then you can't see these bruises. Then you can't see very clearly
the bruises on the other side of the neck. These come out clearly, but these
do not.


[Court]: All right. In the scheme of things I think 162 and 163 are rather innocuous. 


We agree with the trial court and find that the probative value of these photographs
outweighs any prejudicial or duplicative effect. 

 4. Exhibits 165 and 166

 Exhibit 165 is an extreme close-up of the victim's neck illustrating the contusions
and petechial hemorrhages with a ruler present to designate the size of the injured areas.
Exhibit 166 is another close-up of bruised areas with a ruler to denote the size of the
wounds. Dr. Wilson used the exhibits to describe the size of the wounds as being
consistent with fingertip pressure to the victim's neck. The trial court overruled the
objection. We agree with the trial court and find that the probative value of these two
exhibits substantially outweighs their cumulative impact.

 5. Exhibits 167 and 168

 Exhibit 167 is a photograph of the right side of the victim's neck displaying
several areas of dark bruising. Exhibit 168 is an extreme close-up of several abrasions to
the same side of the neck. Dr. Wilson testified that the abrasions were consistent with
ligature points and/or the victim's fingernails attempting to remove the ligature. The
appellant objected, and again, the trial court overruled the objection. We agree with the
trial court. (89)

 6. Exhibits 174 and 176

 Exhibit 174 is a photograph of the victim's neck and chest illustrating the
discoloration and bruises to the area. This exhibit also shows the line created by the
ligature impression on her neck. Exhibit 176 is a photograph of the same area but shows
more of the lower chest area. Dr. Wilson used this exhibit to show the victim's normal
skin color versus the color of the skin that was congested with blood caused by
strangulation. (90) The trial court overruled the appellant's duplicative objection, and we
agree with the trial court.

 7. Exhibits 191 through 193

 The appellant specifically argued at trial that the State needed to choose either
Exhibits 191 and 192 or Exhibits 192 and 193 to illustrate the victim's head wounds, but
not all three. Exhibit 191 shows a close-up of two distinct areas of hematoma to the right
side of the victim's skull. Exhibit 192 is a close-up view of the top of the skull illustrating
the placement of the wounds on the victim's head. Exhibit 193 shows the bleeding on the
scalp itself. Dr. Wilson used these photos to explain the substantial blow to the victim's
head. The placement of the wounds is also consistent with the assault described in the
appellant's confession. According to the record, the appellant began a general 403
prejudice objection, but later narrowed his objection to "duplicitousness" by the time the
trial court ruled.

[Defense]: There is a series of photos beginning at 191 - 191, 192, 193 - 191, 192, and
193 are all photographs of the scalp being there. Obviously, I'm sorry,
shows the contusions inside the scalp, under the scalp and under the surface
under the surface of the skull. And I believe that 191 and 192 or 192 and
193, they need to pick to have those three. To do otherwise is just going to,
is just overwhelming and prejudicial at that point.


[State]: As it relates to 191, 192, 193, the evidence is going to show that she was
struck in the head with an object. No. 191 shows the skull and shows the
two areas of the skull where there is hematoma. 192 shows the placement of
those particular wounds underneath the scalp and the bleeding. 193 shows
the bleeding on the - on the skin itself. And then you'll see this is on the
skull itself. And this shows the same thing, but placement.


[Defense]: Here's what I - let me be more specific. I'm going to object to 191
duplicitous. Whatever needs to be shown in 191 can be showed-


[Court]: Let me ask that question. What is it that 192 and 3 does not show that 191
does?


[State]: 191 shows -


[Court]: Again, 192 and 193 does not show.


[State]: This is 191 is when the skull is refracted and you see these two. Okay. 192
shows the right side toward the back, which is the placement of where this
actually occurred. And it's significant because in the defendant's statement,
193 shows the inside so that you can see the bruising, the hemorrhaging
here on the scalp itself versus this is the skull itself. And the hematoma and
the bleeding that appears on the head.


[Court]: All right. It's overruled. They're admitted. 


While the appellant's argument that the series of photographs would be "overwhelming
and prejudicial," its duplicative and prejudicial impact did not substantially outweigh the
probative value of the photographs. The trial court overruled the objection, and we agree
with the trial court.

 8. Exhibits 202 and 203 and Exhibits 204 and 205

 The appellant also objected to another series of photographs that detail the damage
to the hyoid bone. Exhibit 202 displays the thyroid cartilage and the "horn" that protrudes
from it. The photograph shows a substantial amount of hemorrhage in the soft tissue,
which suggests substantial pressure to the neck. Exhibit 203 is a close-up of the horn
showing that it is broken. The appellant complained of these two exhibits together. And
finally, the appellant objected to Exhibits 204 and 205 as "duplicitous." Exhibit 204 is a
picture of the victim's complete hyoid bone removed from the body, which Dr. Wilson
used to illustrate the substantial neck injury the victim suffered. Exhibit 205 is the close-up of the fractured area of the hyoid exhibiting the extent of the fracture through the bone,
which also helped Dr. Wilson in his testimony. When the trial court questioned the State
as to why it needed both photographs, the State replied "[o]ftentimes the close-up makes
it clearer for the Jury." The trial court promptly overruled the objection and admitted all
four photographs together. Again, we agree with the trial court.

 C. Conclusion

 The trial court did not err in overruling the appellant's objections to the
admissibility of these photographs. The complained-of photographs were not notably
duplicative or cumulative, and they served as an aid to Dr. Wilson's explanation of the
victim's death and the theories relevant to the State's case. While some of the photos are
graphic, they depict the realities of the crime committed. (91) And, although some of the
photos reflect substantial changes of the victim's body due to the autopsy procedures,
these were fully explained to the jury as necessary to complete a thorough examination of
the injuries. 

 The probative value of the photos was not substantially outweighed by any
cumulative effect. While prejudice may be affected by the number of exhibits offered, in
this case, there was a substantial amount of photographs illustrating the victim
immediately after the offense, just prior to the autopsy, and during the autopsy. Each of
these exhibits aided in the testimony given to the jury, providing probative value to the
proffered expert testimony, and to the jury's ultimate determination of guilt.

 We find that the trial judge committed no abuse of discretion in allowing these
photographs into evidence. Point of error eleven is overruled.

 V. MITIGATION EVIDENCE

 The appellant complains on appeal that several records were improperly excluded
during the trial that would have aided the jury in determining his punishment.

 A. Hospital and School Records

 In point of error eight, the appellant contends that the trial court erred at the
punishment phase of the trial in sustaining the State's objection to the admission of three
defense exhibits consisting of hospital and school records. Specifically, he argues that the
exhibits were constitutionally-relevant, self-authenticating business records that should
have been admitted, and that their omission violated his due process right to present
mitigating evidence.

 1. Background

 After the State rested its punishment case, the appellant moved to have three
school and hospital records entered into evidence as business records. (92) Under the Texas
Rules of Evidence, Rule 803(6) is an exception to the hearsay rule. It allows records of
regularly conducted activity, more commonly known as business records, to be admitted
if it can be shown that the records were made at or near the time of the event, recorded by
someone with knowledge, and that it was common practice to keep such a record in the
course of regularly-conducted business. (93) This can be shown through the testimony of the
custodian or other qualified witnesses, or by an affidavit that complies with Rule
902(10). (94) The appellant employed Rule 902(10) and submitted the contested records with
a verified affidavit; however, he did so without complying with the rule's 14-day notice
requirement. (95) The State objected that the records were hearsay because the appellant did
not comply with Rule 902(10). The appellant did not ask for a continuance to either meet
Rule 902 or to bring the custodians of the records as witnesses under Rule 803(6), and
thus, the trial court sustained the State's objection and excluded the records.

 2. Analysis

 When reviewing a trial judge's decision to admit or exclude evidence, an appellate
court must determine whether the judge's decision was an abuse of discretion. (96) Unless
the decision was outside the "zone of reasonable disagreement," an appellate court should
uphold the ruling. (97) Rule 902(10) requires, in pertinent part, that if a party chooses to
verify hearsay business records by affidavit, that party must file the records with the court
and notify the opposing party at least fourteen days prior to trial. The notice period allows
the other party time for inspection. Because a sponsoring witness will not be present at
court, the inspection period allows the opposing party the opportunity to review the
affidavit and proffered records for any problems or concerns that need be addressed
before trial.

 The appellant argues that, because his evidence meets the threshold for
constitutionally-relevant mitigating evidence under Tennard v. Dretke, (98) the records were
per se admissible based on his Fourteenth Amendment and Eighth Amendment
protections, regardless of Rule 902(10). He suggests that the test for constitutional
relevance, as discussed in Tennard, should apply, in which constitutional relevancy is
determined by whether "[r]easonable jurists could conclude that . . . [evidence of
significant impairment in intellectual function is evidence that] might serve 'as a basis for
a sentence less than death.'" (99) Relying heavily on the United States Supreme Court cases
of Chambers v. Mississippi (100) and Holmes v. South Carolina, (101) he contends that the
Fourteenth Amendment's due process right to present a defense is not a right to be
defeated by the "mechanistic" and "arbitrary" application of what may otherwise be
"legitimate" rules of evidence, notably the procedural elements of Rule 902(10).

 This Court has previously held, in Renteria v. State, (102) that the United States
Constitution does not require admission of mitigating evidence when it is inadmissible
under state law, even when the evidence meets the test of "constitutional relevancy." (103)
Although Texas and the United States Supreme Court have established jurisprudence that
no person shall be executed without the opportunity to bring all evidence of mitigating
circumstances, the United States Constitution does not require the admission of evidence
if it is in a form that is otherwise objectionable. (104) In other words, relevant evidence must
be presented in a form that is acceptable to the laws of evidence of the State in order to be
received over objection. (105) The Supreme Court's decision in Tennard does not alter
this, (106) and neither do Chambers and Holmes. 

 In Chambers, the appellant's defense was thwarted by two separate state
evidentiary rules. Chambers was arrested and tried for murder, maintaining his innocence
for the duration of the trial, and asserted that Gable McDonald, a witness, was the actual
killer. McDonald confessed to the murder in question to three separate individuals on
numerous occasions. McDonald's statements were admissions against his penal interest -
a common exception to the hearsay rule, (107) and they were corroborated by other evidence
in the case. Furthermore, McDonald, the third-party was present in the courtroom, under
oath and subject to cross-examination. (108) The State of Mississippi, however, did not
recognize the "admission against penal interest" exception to the hearsay rule; as a result,
the trial court refused to allow the defendant to introduce the testimony of the three
persons to whom the confessions were made. (109) The second evidentiary barrier to the
appellant was Mississippi's "voucher" rule, which prevented the defendant from being
able to cross-examine the third-party witness (whom the defendant called because the
State failed to do so), as it did not allow Chambers to impeach his own witness. (110) The
Supreme Court repudiated the voucher rule and held that Chambers' due process was
denied, stating that "the exclusion of this critical evidence, coupled with the State's
refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with
traditional and fundamental standards of due process." (111) 

 Chambers is distinguishable from the present case for several reasons. First, the
Supreme Court has stated that Chambers does not stand for the proposition that the
defendant is denied a fair opportunity to defend himself whenever a state or federal rule
excludes favorable evidence, as is the issue in the case at bar. (112) In Chambers, the Court
found error only because the evidence "bore persuasive assurances of trustworthiness"
and thus was "well within the basic rationale of the exceptions for declarations against
interest." (113) In other words, the Court held that the evidence was admissible because it did
meet evidentiary rules; the problem was that Mississippi had not yet adopted those rules.
Second, the evidentiary rules in the instant case are not the same substantively or
procedurally as they were in Chambers. The rule in Chambers focused on declarations
against interest for hearsay statements from the accused or witnesses, while the instant
rule provides procedural guidelines specifically for business records with respect to
inspection and preparation. No amount of inspection would change the fundamental
principle of the Mississippi law. Third, the issue in Chambers was part of the guilt and
innocence section of the trial, while the issue in the present case is for punishment only.
In summary, we find that the appellant reads Chambers too broadly for it to apply to this
case. (114)

 Similarly, in Holmes, the appellant's defense to a murder charge was precluded by
an evidentiary rule. Holmes was charged with murder, first-degree criminal sexual
conduct, first-degree burglary, and robbery, and was sentenced to death. While the State
had substantial forensic evidence connecting the appellant to the offense, the appellant
"attempted to undermine the State's forensic evidence by suggesting that it had been
contaminated and that certain law enforcement officers had engaged in a plot to frame
him." (115) He also sought to introduce proof that a third-party was actually responsible for
the murder, including the testimony of several witnesses who provided an alibi and even
one who admitted to committing the offense. The trial court denied this evidence based
on state precedent precluding admissibility of third-party guilt evidence unless it raises a
reasonable inference of the defendant's innocence. (116) The United States Supreme Court
held that "this Court's cases contain several illustrations of 'arbitrary' rules, i.e., rules that
excluded important defense evidence but that did not serve any legitimate interests." (117)
The Court noted that the due process right was offended by rules that are "arbitrary" or
"disproportionate" to the purposes they are designed to serve, such as rules that exclude
important defense evidence but do not serve any legitimate interests. (118)

 In the instant case, the Texas evidentiary rules requiring the authentication of
proffered hearsay evidence are not "arbitrary or disproportionate," as they serve the
legitimate purpose of assuring the trustworthiness of the evidence. (119) The procedural
requirement is expressly applied without any sense of arbitrariness. It is a bright-line rule
that is: (1) established by the Texas Rules of Evidence and not common-law precedent,
(2) procedural and not substantive, and (3) applied uniformly. For this Court to find the
14-day rule "arbitrary," we would be forced to apply it erratically, choosing haphazardly
what cases need to comply with established limits and which do not. We will not entertain
such a notion. As a result, Holmes is likewise inapplicable to the appellant. 

 Having found that Chambers and Holmes are distinguishable from the present
case, we return to the rules of evidence. Quite simply, the appellant did not comply with
either Rules 803(6) or 902(10) to establish the authenticity of the proffered records.
Although he did supply an affidavit with these business records, he failed to do so within
the statutory 14 day limit. He cannot now rely on the fundamental protections of due
process to cure his preventible error. Because of this, we find that the trial court did not
abuse its discretion by declining to admit the records over the State's well-founded
objection. Point of error eight is overruled.

 B. Videotaped Interview

 In point of error nine, the appellant objects that the trial court erred by not allowing
him to present a 41-minute videotaped interview of his mother, Ms. Ester Mae Smith,
addressing various aspects of his childhood, schooling, and hospitalization. 

 1. Background

 The appellant attempted to admit the videotaped interview of his mother along
with the three previously discussed business records during the punishment phase of his
trial. (120) The State objected to the admission of the tape on hearsay grounds since it would
not have an opportunity to cross-examine the witness. The appellant explained that his
mother was not in attendance at trial for two reasons: (1) she had "health issues," and (2)
"she doesn't want to come up here and release the family secrets." The State replied that
"we'd object to the admission of a videotape of a witness that we don't have the chance to
cross-examine." The trial court sustained the State's objection and excluded the tape. On
appeal, the appellant admits that the videotaped testimony is hearsay, but relies on the
same legal argument as his eighth point of error. Again, he contends that his Fourteenth
Amendment due process right to present evidence and his Eighth Amendment right to
present constitutionally-relevant mitigating evidence should trump the evidentiary hearsay
rules.

 2. Analysis

 When reviewing a trial judge's decision to admit or exclude evidence, an appellate
court must determine whether the trial judge's decision was an abuse of discretion. (121)
Again, unless the trial judge's decision was outside the "zone of reasonable
disagreement," an appellate court should uphold the ruling. (122)

 Hearsay "is a statement, other than one made by the declarant while testifying at
the trial or hearing, offered in evidence to prove the truth of the matter asserted." (123)
Hearsay statements are generally inadmissible, unless they fall into one of the exceptions
in Rules 803 and 804. (124)

 Here, the record shows that appellant failed to argue - either at trial or on appeal - 
that any exception to the hearsay rule applies in this case. Instead, he attempted to
circumvent established evidentiary law to invoke his constitutional rights to present
relevant evidence of mitigation. As previously established, "[a] defendant's right to
present relevant evidence is not unlimited, but rather is subject to reasonable
restrictions." (125) We believe such reasonable restrictions include state evidentiary laws. (126)
Moreover, this Court has previously held that the United States Constitution does not
require admission of mitigating evidence when it is inadmissible under state law, even
when the evidence meets the test of "constitutional relevancy." (127) This Court has also held
that "state and federal rulemakers have broad latitude under the Constitution to establish
rules excluding evidence from criminal trials. Such rules do not abridge an accused's
right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the
purposes they are designed to serve.'" (128)

 In this case, we note that the videotaped testimony does not fall under any of the
hearsay exceptions listed in Rules 803 or 804. Further, the appellant offered no argument
in support of any hearsay exception, relying solely on his constitutional rights to due
process of law. Even assuming that the exclusion of this evidence was erroneous under
state law, we find that there was no constitutional error unless the evidence formed such a
vital portion of the case that its exclusion effectively precluded the defendant from
presenting a defense. (129) The appellant was not prohibited from presenting a defense in the
form of mitigation testimony; nor was he prohibited from introducing defense witnesses.
Testimony was elicited from the appellant's punishment witnesses concerning his stay at
the Mandeville State Hospital, his problems concerning his education, and his lack
thereof. Defense witness Jennifer McIntyre provided details about the appellant's
childhood, his schooling, the abuse he suffered, and the conditions in which he was
raised. McIntyre testified to his running away from home, his subsequent homeless life
under a bridge, and his time at the state hospital. Harris County Deputy Willie Drew
testified to the appellant's suicide attempt in jail. 

 While the videotape of the appellant's mother may be relevant to the mitigation
special issue, the exclusion of this evidence does not amount to a denial of his
constitutional right to present mitigating evidence because the exclusion of the evidence
was not "unconstitutionally arbitrary or disproportionate." (130) In fact, a vast amount of the
same evidence came in through other witnesses and in different form, specifically through
the testimony of McIntyre. (131) The fact that the appellant was not able to present his case
in the form he desired does not amount to constitutional error when he was not prevented
from presenting the substance of his defense to the jury. Point of error nine is overruled.

VI. DEFINITION OF "SOCIETY"

 In his tenth point of error, the appellant complains that the trial court failed to
provide a proper definition of "society" within the future dangerousness special issue, in
violation of his rights under the Eighth and Fourteenth Amendments. Specifically, he
argues that the trial court should have limited the jury's consideration of "society," so that
it should be used in the context of "prison society." This Court has consistently held that
terms such as "society" and "continuing threat to society" require no special definition. (132)
Further, the appellant has not provided us with a reason to revisit the issue under these
circumstances. (133) Point of error ten is overruled.

 We affirm the judgment of the trial court.

 

Delivered September 29, 2010.

Do not publish.
1. Tex. Penal Code § 19.03(a). 
2. Art. 37.071§ 2(g). Unless otherwise indicated, all future references to Articles refer to the Texas Code of
Criminal Procedure.
3. Art. 37.071 § 2(h). 
4. See Tex. Penal Code § 19.03(a)(2). 
5. Leona Walker was initially in the group of evacuees who was first helped by Blair; however, she was no
longer involved with the appellant, Le, Jacobo, or the victim at the time of the offense.
6. The appellant's first point of error states, "Appellant's statement - made in immediate response to
Detective Rogge's threat that unless he 'confessed' 'I'll get you the death penalty' - was involuntary and
inadmissible as a matter of due process, because in the totality of circumstance, the threat was objectively so
coercive in nature, as to overbear appellant's will." 

 

 The appellant's second point of error reads, "The same statement was also involuntary and inadmissible as a
matter of state statutory law, because the detective's explicit threat was so inherently likely, in the circumstances, to
induce him to speak untruthfully, as to make it unlikely that the statement was a product of his free and unfettered
choice."


 The appellant's third and fourth points of error collectively state, "The trial court committed reversible error
in admitting appellant's statement which was obtained without a 'knowing, intelligent and voluntary waiver' of his
Miranda rights, in violation of the bright-line rule of Miranda and Art.38.22, Sec. 3(a)(2), V.A.C.C.P. by his
deliberate use of a procedure calculated to undermine those protections."
7. Miranda v. Arizona, 384 U.S. 436 (1966); see also Art. 38.22 § 3(a)(2). 
8. The trial court found that Rogge had first read appellant his Article 38.22 rights at the scene of the arrest.
The record does not support this finding as Rogge testified that he did not speak to the appellant until after he was
transported to the Pasadena police station. Finding no. 3 actually sets out the first time Rogge read the appellant his
rights. This unsupported finding, however, does not affect the final disposition of the appellant's points of error.
9. Miranda, 384 U.S., at 436.
10. Id.
11. Article 38.22 § 2 (a) requires that an accused receive the following warnings: (1) he has the right to
remain silent and not make any statements, (2) any statements he makes may be used against him in court, (3) he has
the right to have a lawyer present to advise him before and during the questioning, (4) if unable to employ a lawyer,
he has the right to have a court-appointed lawyer, and (5) he has the right to terminate the interview at any time. See
also Miranda, 384 U.S., at 436.
12. Barefield v. State, 784 S.W.2d 38, 40-41 (Tex. Cr. App. 1989). 
13. Mays v. State, 726 S.W.2d 937, 946 (Tex. Cr. App. 1986).
14. Barefield, 784 S.W.2d, at 40-41.
15. Id.; see also Berry v. State, 582 S.W.2d 463, 465 (Tex. Cr. App. 1979).
16. 919 S.W.2d 370, 385-87 (Tex. Cr. App. 1996).
17. Id., at 385-86. 
18. Id., at 386. 
19. The appellant's second point of error is based on Texas law, while his first is based on the federal
protections of due process under the Fifth and Fourteenth Amendments of the United States Constitution. He argues
them together in his brief, without distinguishing the state and federal claims, and so we shall also address them
together.
20. State v. Kelly, 204 S.W.3d 808, 818 (Tex. Cr. App. 2006).
21. Id., at 818. 
22. Romero v. State, 800 S.W.2d 539, 543 (Tex. Cr. App. 1990).
23. Colorado v. Connelly, 479 U.S. 157, 167-69 (1986).
24. Id. (emphasis added).
25. Penry v. State, 903 S.W.2d 715, 744 (Tex. Cr. App. 1995); see also Griffin v. State, 765 S.W.2d 422,
429 (Tex. Cr. App. 1989).
26. See Dragoo v. State, 96 S.W.3d 308, 313 (Tex. Cr. App. 2003) ("As a general rule, an appellate court
reviewing a trial court's ruling on the admission or exclusion of evidence must do so in light of the arguments,
information, and evidence that was available to the trial court at the time it ruled.").
27. The only argument made with any specificity occurred during trial when the appellant again presented
his objection. Yet, he only cited to three page numbers from a written transcript that was never made part of the
record. He did not make a record of what was on those pages. Therefore, we do not know if the appellant's
complaint at trial even comports with his complaint on appeal. Nevertheless, in the interest of justice, we shall
address the claim.
28. Penry, 903 S.W.2d, at 744. 
29. Compare Sherman v. State, 532 S.W.2d 634 (Tex. Cr. App. 1976) (confession found involuntary when
uncontroverted evidence showed that the defendant would not have signed his confession but for the fact the officer
convinced him that he would get the death penalty if he did not), with Bonham v. State, 680 S.W.2d 815, 821 (Tex.
Cr. App. 1984) (confession admitted because there was evidence that the defendant's statement was voluntary even
though officer told defendant that he would get the death penalty if he did not make a statement). 
30. See generally Bonham, 680 S.W.2d, at 821 (where the appellant litigated the issue of voluntariness at
trial, in contrast to the instant case, where the appellant never even objected to the issue until appeal).
31. 259 S.W.3d 159 (Tex. Cr. App. 2008).
32. Tex. R. App. Proc. 33.1.
33. Almanza v. State, 686 S.W.2d 157 (Tex. Cr. App. 1985).
34. Id., at 171 ("[I]f no proper objection was made at trial and the accused must claim that the error was
'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a
fair and impartial trial' -- in short 'egregious harm.').
35. Article 38.22 § 6 reads in its entirety:


 "In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must
make an independent finding in the absence of the jury as to whether the statement was made under voluntary
conditions. If the statement has been found to have been voluntarily made and held admissible as a matter of law and
fact by the court in a hearing in the absence of the jury, the court must enter an order stating its conclusion as to
whether or not the statement was voluntarily made, along with the specific finding of facts upon which the
conclusion was based, which order shall be filed among the papers of the cause. Such order shall not be exhibited to
the jury nor the finding thereof made known to the jury in any manner. Upon the finding by the judge as a matter of
law and fact that the statement was voluntarily made, evidence pertaining to such matter may be submitted to the jury
and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily
made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof. In any
case where a motion to suppress the statement has been filed and evidence has been submitted to the court on this
issue, the court within its discretion may reconsider such evidence in his finding that the statement was voluntarily
made and the same evidence submitted to the court at the hearing on the motion to suppress shall be made a part of
the record the same as if it were being presented at the time of trial. However, the state or the defendant shall be
entitled to present any new evidence on the issue of the voluntariness of the statement prior to the court's final ruling
and order stating its findings."
36. Oursbourn, 259 S.W.3d, at 175. 
37. Id., at 165 ("[W]hen the evidence raises an issue of the 'voluntariness' of a defendant's statement under
Article 38.22, the trial judge must give a general voluntariness instruction under Sections 6 and 7 of that article
because it is the 'law applicable to the case.' But when the defendant does not request this statutorily mandated
instruction, the trial court's failure to include it is reviewed only for 'egregious harm' under Almanza.").
38. Almanza, 686 S.W.2d, at 171 ("[I]f no proper objection was made at trial and the accused must claim that
the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he
'has not had a fair and impartial trial' -- in short 'egregious harm.'").
39. Batson v. Kentucky, 476 U.S. 79 (1986); see also Art. 35.261.
40. 476 U.S., at 88.
41. Id., at 94-98. 
42. Batson, 476 U.S.,at 96-97; see also Miller-El v. Dretke, 545 U.S. 231, 267 (2005) (Breyer, J.,
concurring). 
43. Purkett v. Elem, 514 U.S. 765, 768 (1995).
44. Cantu v. State, 842 S.W.2d 667, 689 (Tex. Cr. App. 1992); Harris v. State, 827 S.W.2d 949, 955 (Tex.
Cr. App. 1992). 
45. Williams v. State, No. 1088181 2009 LEXIS 1751, *24 (Tex. Cr. App. Dec. 16, 2009).
46. Batson, 476 U.S., at 96.
47. Snyder v. Louisiana, 552 U.S. 472 (2008); Miller-El, 545 U.S., at 239.
48. Batson, 476 U.S., at 97.
49. See Miller-El, 545 U.S., at 241.
50. Snyder, 552 U.S., at 485-86. 
51. See Miller-El, 545 U.S., at 241.
52. Id., at 240-41.
53. Id., at 241, quoting Miller-El v. Cockrell, 537 U.S. 322, 342 (2003) ("The prosecutors used their
peremptory strikes to exclude 91% of the eligible African-American venire members . . . . Happenstance is unlikely
to produce this disparity."). 
54. Miller-El, 545 U.S., at 241. 
55. Id.
56. Snyder, 552 U.S., at 485-86.
57. Id., at 475-76.
58. Id.
59. Id., at 478. 
60. Id., at 482-84.
61. Id., at 485.
62. Hernandez v. New York, 500 U.S. 352, 359 (1991) ("Once a prosecutor has offered a race-neutral
explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional
discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").
63. We have no information in the record before us to determine whether the defense exercised any of its
peremptory strikes against African-Americans. We recognize from the record, however, that 159 venire persons were
struck for cause or by agreement by both sides. 
64. Yolanda Branch, venire member 179, was the second African-American to be peremptorily struck from
the panel. We will address Branch following the discussion of Traylor.
65. We note that four of the selected jurors had answers on their questionnaires stating that they had either
previously been opposed to the death penalty, thought it to be uncivilized, or thought it was wrong but necessary.
Each of these jurors explained on voir dire, however, that they had accidentally marked the wrong answer on the
questionnaire or explained that they had been thinking only of a particular fact pattern. Each of them also stated that
they were comfortable sitting on a capital jury that must consider the death penalty.
66. Miller-El, 545 U.S., at 269, citing Georgia v. McCollum, 505 U.S. 42 (1992) ("[T]he Court has widened
and deepened Batson's basic constitutional rule. It has applied Batson's antidiscrimination test to the use of
peremptories by criminal defendants.").
67. See Purkett, 514 U.S., at 768; Snyder, 552 U.S., at 485-86
68. While both Traylor and French are female venire members, Ms. McAnulty, a female prosecutor
questioned Traylor on voir dire, while Mr. Hart, a male prosecutor questioned French. Other than the gender
differences between the two prosecutors, this Court does not glean any difference in treatment in questioning or
demeanor between Traylor and French's experiences.
69. See Art. 35.17 § 1.
70. Snyder, 552 U.S., at 478.
71. See Art. 35.17 § 1.
72. From our understanding of the record, the prosecutor meant to refer to Branch.
73. Miller-El, 545 U.S., at 306 (the "environment" of racial discrimination was based on a DA manual
written in 1968, in which prosecutors were instructed to strike black jurors).
74. On appeal, the appellant alleges that there "was an environment of racial hatred of blacks that existed in
Pasadena." This argument is in sharp contrast to the environment in the Dallas County District Attorney's Office, in
which prosecutors were trained with a manual to racially discriminate against African-Americans. Here, the appellant
presented no compelling evidence of any kind signifying an environment of racial hostility to the trial court, nor does
he present any to this Court. 
75. The appellant requests that this Court remand his case for explicit findings as to whether the State's
specific reasons were race-based under Guzman v. State, 85 S.W.3d 242, 254-55 (Tex. Cr. App. 2002). This remedy
is not necessary. Here, the trial court specifically ruled that the State's reasons for striking both Traylor and Branch
were not race-based. In Guzman, we remanded the case for further findings because, while the Batson challenge and
ruling at trial regarded a race-based strike, the challenge on appeal was that the State's strike was a gender-based
violation of Batson, and one of the race-neutral reasons the State gave was that the venire person was male. The trial
court had not ruled on whether the State would have struck the venire person regardless of his gender, and we
required a finding on that issue. Guzman does not hold that a trial court is required to address the plausibility of each
reason given by the State in detail, nor do we find any other authority to so hold. 
76. In his brief, the appellant challenges the trial court's ruling regarding the admission of 20 photographs,
including State's Exhibit 140. The trial court sustained appellant's Rule 403 objection to this exhibit and the
photograph was not admitted into evidence. Therefore, the appellant's argument regarding State's Exhibit 140 is
without merit.
77. See Tex. R. Evid. 403:


 "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the
danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or
needless presentation of cumulative evidence."
78. See Tex. R. App. Proc. 33.1(a).
79. Tex. R. App. Proc. 33.1(a):


"(a) As a prerequisite to presenting a complaint for appellate review, the record must show that:

 (1) the complaint was made to the trial court by a timely request, objection, or motion that:

 (A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient
specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from
the context; and

 (B) complied with the requirements of the Texas Rules of Civil or Criminal Evidence or the Texas Rules of
Civil or Appellate Procedure; and

 (2) the trial court:

 (A) ruled on the request, objection, or motion, either expressly or implicitly; or

 (B) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal."
80. The appellant did object to the prejudicial nature of State's Exhibit 140; however, that objection was
sustained and the "inflammatory" photograph was never entered into evidence.
81. At one point, the appellant's argument even bleeds into Batson territory, claiming that "the prosecutors
used their strikes, when they were forced to, to keep even the most 'ideal' Black juror from taking a seat in the jury
box." We have already ruled on the issue of racial discrimination in jury selection and find that this accessory to a
403 objection to be without merit. 
82. Portions of the appellant's brief read as follows: "Because of this particular race-of-the-victim factor -
the unique unfair prejudicial effect of admitting the photographs in the circumstances of Appellant's trial, he asks
this Court to find that the admission of those photographs was an abuse of discretion. For that same reason - the
racial factor that impermissibly permeated the trial, this Court should find that Appellant was harmed by this
violation of his substantial rights, under Tex. R. App. P. 44.2(b) and reverse the conviction.
83. Tex. R. Evid. 403; Long v. State, 823 S.W.2d 259, 271 (Tex. Cr. App. 1991), (citing Montgomery v.
State, 810 S.W.2d 372, 389 (Tex. Cr. App. 1991) (op. on reh'g)). 
84. Montgomery, 810 S.W.2d, at 391. 
85. Long, 823 S.W.2d, at 270.
86. Id., at 272.
87. The appellate record contains only black and white copies of the exhibits. We rely upon the State's
representation that the actual exhibits presented to the jury are in color. If the appellant believed that the colors in the
actual photographs would have made a difference in our assessment of prejudice, it was incumbent upon him to
insure that either the original photographs or color copies were included in the record. See Williams v. State, 958
S.W.2d 186, 196 n.10 (Tex. Cr. App. 1997). Nevertheless, we deem that the exhibits as provided are sufficient to
address the appellant's point of error.
88. From the record, it appears that Exhibits 123 and 124 are both photographs of the ligature around the
victim's neck that aided Dr. Wilson, the expert medical examiner in his testimony. The Court ruled together in 123
and 124, overruling the appellant's duplicative objection.
89. The appellant objected to this pair of photographs in one phrase, without expressly stating that they were
duplicative. As a result, it is unknown whether this objection was to the gruesome nature of the photographs. Yet,
since the objection was part of a larger pattern of objections and the objection to photographs in pairs were that they
were duplicative, we presume that this objection was as well.
90. The ligature mark is not as visible on this exhibit.
91. See Narvais v. State. 840 S.W.2d 415, 429-30 (Tex. Cr. App. 1992), (citing Long, 823 S.W.2d at 273)
("Most significantly, the photographs, although gruesome, merely depict the gruesomeness of the crime scene as
found by the police. Although a crime scene may be gruesome, 'that fact alone will not [necessarily] render the
probative value of [photographic] exhibits [of the crime scene] substantially outweighed by any prejudicial effect.'").
92. The contested exhibits are Defense Exhibits 9, 10, and 11, which are the records from Assumption Parish
School, LaFourche Parish School, and Mandeville State Hospital, respectively. 
93. Tex. R. Evid. 803(6):


The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness: 

* * * 

(6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of
acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a
person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular
practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the
testimony of the custodian or other qualified witness, or by affidavit that complies with Rule 902(10), unless the
source of information or the method or circumstances of preparation indicate lack of trustworthiness. "Business" as
used in this paragraph includes any and every kind of regular organized activity whether conducted for profit or not.
94. Tex. R. Evid. 803(6).
95. The appellant confesses to his failure to supply the records within the time allowed by the rules, stating,
"We're asking to let these in in front of the business - as business records affidavit, although they weren't filed under
the business records statute."
96. Torres v. State, 71 S.W.3d 758, 760 (Tex. Cr. App. 2002). 
97. Id. 
98. 542 U.S. 274 (2004) (holding that evidence of low IQ scores was constitutionally relevant evidence for
mitigation in a death penalty case because reasonable jurists could have concluded that the evidence was relevant
mitigating evidence).
99. Id., at 288, (citing Skipper v. South Carolina, 476 U.S. 1, 5 (1986)).
100. 410 U.S. 284 (1973).
101. 547 U.S. 319 (2006).
102. 206 S.W.3d 689 (Tex. Cr. App. 2006).
103. Renteria, 206 S.W.3d, at 697; Lewis v. State, 815 S.W.2d 560, 568 (Tex. Cr. App. 1991); see also
Tennard, 542 U.S., at 283.
104. Renteria, 206 S.W.3d, at 697; see also Lewis, 815 S.W.2d, at 568. 
105. Id.
106. Renteria, 206 S.W.3d, at 697.
107. Chambers, 410 U.S., at 298-99. 
108. Id., at 300-01.
109. Id., at 299.
110. Id., at 295-96. 
111. Id., at 302.
112. See United States v. Scheffer, 523 U.S. 303, 316-17 (1998); Valle v. State, 109 S.W.3d 500, 506 (Tex.
Cr. App. 2003). 
113. 410 U.S., at 302.
114. Chambers, 410 U.S., at 302-03 ("In reaching this judgment, we establish no new principles of
constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in
the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply
that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.").
115. Holmes, 547 U.S., at 322.
116. Holmes, 547 U.S., at 323-24 (citing State v. Gregory, 198 S.C. 98, 16 S.E.2d 532 (1941)).
117. Holmes, 547 U.S., at 323. 
118. Id., at 331("The point is that, by evaluating the strength of only one party's evidence, no logical
conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast
doubt. Because the rule applied by the State Supreme Court in this case did not heed this point, the rule is 'arbitrary'
in the sense that it does not rationally serve the end that the Gregory rule and other similar third-party guilt rules
were designed to further.").
119. See Tex. R. Evid. 803(6); see generally Saavedra v. State, 297 S.W.3d 342, 347 (Tex. Cr. App. 2009).
120. The trial court ruled on the complained-of evidence of the appellant's eighth and ninth points of error
together.
121. Torres v. State, 71 S.W.3d 758, 760 (Tex. Cr. App. 2002). 
122. Id. 
123. Tex. R. Evid. 801(d).
124. Tex. R. Evid. 802.
125. Potier v. State, 68 S.W.3d 657, 659 (Tex. Cr. App. 2002).
126. See Renteria, 206 S.W.3d, at 689.
127. Id., 206 S.W.3d, at 697.
128. Potier, 68 S.W.3d, at 659.
129. Id., at 663; see also Valle, 109 S.W.3d, at 506.
130. Potier, 68 S.W.3d, at 659.
131. See id. We acknowledge that the evidence as admitted does not convey the identical evidence, as it
would have been viewed through the videotaped interview with the appellant's mother. Yet this slight variance (a)
does not change the fact that much of the same testimony was presented to the jury through these other witnesses,
and (b) rise to due process violation.
132. Hunter v. State, 243 S.W.3d 664, 672 (Tex. Cr. App. 2007); see also Blue v. State, 125 S.W.3d 491,
504-05 (Tex. Cr. App. 2003); Earhart v. State, 877 S.W.2d 759, 767 (Tex. Cr. App. 1994). 
133. We wish to note that the venire panel was informed that the term "society" includes "prison society"
during voir dire, and all of the chosen jury members stated that they understood.